IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


PHILLIP VAN ZANT,
     Petitioner,

vs.                                  Case No. 5:05cv208/RS/EMT

FLORIDA PAROLE COMMISSION,
     Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1), supporting documents (Doc. 2), supporting legal memorandum (Doc. 12), and supplemental pleading (Docs. 27, 152). The Florida Parole Commission (hereinafter Parole Commission) filed an answer and supplemental answer to the petition and relevant portions of the state court record (*see* Doc. 19, Exhibits; Docs. 129, 153). Petitioner filed a reply and supplemental reply (Docs. 149, 161, 163).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 19, Exhibits; Doc. 129, Exhibits). Petitioner's history with the Parole Commission began with his commitment in the Florida Department of Corrections for second

degree murder in 1979 (Doc. 129-1, Ex. A). Petitioner's first grant of parole was in 1983 (Doc. 129-1, Ex. C). He violated his parole conditions by possessing a rifle and shotgun, which led to revocation of his parole 1985 (*id.*). In 1986, he was again granted parole (Doc. 129-1, Ex. D). He violated his conditions by failing to follow the instructions of his parole officer to have no contact with his wife without prior written authorization, which led to revocation of his parole in 1987 (*id.*). Petitioner was paroled again in 1991 (Doc. 129-1, Ex. E). He violated his conditions by committing criminal trespass on another woman's property and having contact with her on numerous occasions after having been instructed to have no contact, which led to revocation of his parole in 1992 (*id.*). Petitioner was most recently paroled in 1999 (Doc. 129-2, Ex. F). On August 8, 2001, the Parole Commission revoked his parole based upon the determination that he violated condition 7 of his parole by "failing to obey all laws ordinances or statutory conditions of Parole in that on or about July 26, 2000, in Clarke County, Georgia, he did unlawfully and intentionally make harassing phone calls to Virginia Baird Johnston, by repeatedly calling [her], after being told by [her] not to call" (*see* Doc. 19, Ex. A). This revocation is the subject of the instant federal habeas action.

Petitioner sought review of the Parole Commission's decision in the Florida courts by filing a petition for writ of habeas corpus in the Circuit Court in and for Lafayette County, Florida, Case No. 2001-CA-000117 (Doc. 19, Ex. B). On October 1, 2001, the state court denied the petition (Doc. 19, Ex. C). Petitioner sought review of the decision by filing a petition for writ of certiorari in the Florida First District Court of Appeal (hereinafter First DCA) (Doc. 19, Ex. E). On October 3, 2002, the appellate court denied the petition for certiorari (Doc. 19, Ex. F). Van Zant v. Florida Parole Comm'n, 835 So. 2d 1117 (Fla. 1st DCA 2002) (Table).

On March 6, 2002, Petitioner filed a petition for writ of mandamus in the in the Circuit Court in and for Leon County, Florida, Case No. 2002-CA-000753, seeking to set aside the parole revocation (Doc. 19, Ex. G). On October 16, 2002, the court issued an order dismissing the petition as an abuse of the writ (Doc. 19, Ex. I). Petitioner sought review of the decision by filing a petition for writ of certiorari in the First DCA (Doc. 19, Ex. J). On July 8, 2003, the appellate court denied the petition (Doc. 36, Ex. K). Van Zant v. Florida Parole Comm'n, 853 So. 2d 414 (Fla. 1st DCA 2003) (Table).

On July 8, 2003, Petitioner filed another habeas petition challenging the parole revocation; this time he filed it in the Circuit Court in and for Escambia County, Florida, Case No. 2003-CA-001397 (Doc. 36, Ex. L). On January 8, 2004, the state court dismissed the petition for abuse of the writ (Doc. 36, Ex. N). Petitioner sought review of the decision by filing a petition for writ of certiorari in the First DCA (Doc. 36, Ex. O). On July 30, 2004, the appellate court dismissed the case for lack of jurisdiction (Doc. 36, Ex. P). <u>Van Zant v. Florida Parole Comm'n</u>, 886 So. 2d 232 (Fla. 1st DCA 2004) (Table).

Petitioner filed the instant federal habeas action on October 7, 2005 (Doc. 1).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

---

[1] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 496 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 551 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 496 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III. PETITIONER'S CLAIMS

Ground One: "Actual Innocence/Fundamental Error—Respondent failed to show essential element of crime charged."

Petitioner claims there was insufficient evidence to support the parole revocation, and the Parole Commission and state court's adjudication of this claim was based upon an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding (Doc. 1 at 6–9; Doc. 12 at 1–16; Doc. 27, attached Supplemental Pleading; Doc. 149 at 1–21, 43–44).[2]  He contends he was charged with violating Condition #7 of his parole, which required him to obey all laws or statutory conditions of parole, by making harassing phone calls to a former girlfriend, Virginia Johnston (*see id.*).  Petitioner contends the evidence failed to show that he violated Georgia law (either O.C.G.A. § 16-11-39.1, which defines the crime of making harassing phone calls, or O.C.G.A. § 46-5-21, which defines the crime of using the telephone for obscene purposes), because there was no evidence that conversation ensued during any of the phone calls and no evidence that he made any phone calls with the intent to harass Ms. Johnston, which are essential elements of the crimes defined in those statutes (*id.*).  Petitioner argues that the hearing examiner made no factual finding that he telephoned Ms. Johnston with the intent to harass her, and there was no evidence of such intent (*id.* at 5).  Petitioner states he was never convicted of a violation of Georgia's harassing phone call law; in fact, the prosecutor filed a notice of his intent not to prosecute the charge on December 4, 2000.  He also contends the evidence, including Ms. Johnston's testimony and the transcript of her answering machine tapes, demonstrated that he did not intend to harass her when he called her.  Petitioner states Ms. Johnston acknowledged at the hearing that Petitioner's purpose for calling her was to persuade her to continue their relationship (Doc. 149 at 17).  He further contends the transcripts of Ms. Johnston's answering machine tapes showed that Petitioner left three "polite" messages on her machine on a Monday, and he made four attempts to call her collect from the county jail on Thursday, July 27, 2000, after he was arrested for the parole violation (*see* Doc. 27, attached Supplemental Pleading at 4–5 and attached transcript; Doc. 149 at 8, 11–12).  The answering machine transcript shows that Ms. Johnston received two more attempted collect calls on Sunday, and then a call from Petitioner's brother on Monday (*see* Doc. 27, attached transcript).  Petitioner additionally contends that Ms. Johnston's testimony that he called her 150–200 times from July 5–26, 2000, is refuted by her telephone records, which did not show any calls from the 912 area code (the area code where Petitioner lived) (Doc. 149 at 18).  Petitioner states that Investigator Cole

---

[2] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

acknowledged in his testimony that the telephone records dating from July 11–26, 2000, did not indicate repeated phone calls by Petitioner (Doc. 12 at 6). Petitioner additionally points out that the telephone records showed that Ms. Johnston called him on three occasions during that period, July 18, July 19, and July 24 (Doc. 149 at 17, 18). Petitioner acknowledges that when his counsel asked Ms. Johnston why she called Petitioner, she responded that she was calling to tell him to quit calling her (Doc. 1 at 9). In support of his claim that there was insufficient evidence that he violated Georgia's harassing phone call statute, Petitioner cites cases from Massachusetts, Maryland, and Florida in which those courts have overturned convictions under similar statutes because there was insufficient evidence to prove the defendant's intent to harass beyond a reasonable doubt (Doc. 149 at 13–16).

Additionally, Petitioner states that Ms. Johnston's credibility was impeached by evidence that she invited Petitioner to her home over the July 4th weekend of 2000, and she called him three times after that. Petitioner further asserts Ms. Johnston was motivated to falsely accuse him of making harassing phone calls because she was angry over the fact that he had not previously told her that he was on parole. Petitioner states that after the final revocation hearing, he obtained additional evidence that would have impeached Ms. Johnston's credibility. He states he received information that Ms. Johnston was convicted of felony hit and run in 1994 and subsequently violated her probation twice for public intoxication and once for battery on a police officer.

The Parole Commission further contends that the actual innocence standard does not apply to the instant case (Doc. 129 at 11). The Commission contends an actual innocence claim is not itself a basis for habeas relief but merely a means for obtaining federal review of a procedurally barred constitutional claim (*id.* at 11–12). The Commission argues Petitioner is attempting to assert actual innocence as an independent basis for challenging the parole revocation, not to overcome a procedural bar; therefore, his claim is not cognizable (*id.* at 11). The Parole Commission further argues that Petitioner has failed to show the existence of new reliable evidence that was not presented at the revocation hearing; and he has failed to establish that it is more likely than not that, in light of the new evidence, no reasonable parole examiner would have found him guilty by a preponderance of the evidence (*id.* at 12–14).

The Parole Commission further contends that conviction of a new crime is not necessary to find a violation of parole (*id.* at 14). The fact finder may determine, independent of a formal conviction, that a law has been violated, including a determination that a specific intent element was satisfied (*id.* at 14, 17). Even if a parolee has been acquitted of a new law violation, the fact finder in a parole revocation hearing may determine that a parole violation occurred based on the same conduct (*id.*). The Parole Commission argues that in Petitioner's case, the record shows that the criminal charge of making harassing phone calls was not prosecuted by the State of Georgia because Petitioner was being returned to Florida on the parole violation, not for lack of evidence (*id.* at 14–15).

The Parole Commission contends that under Florida law, a state court reviewing a decision of an administrative agency, such as the Parole Commission, may not re-weigh the evidence or reevaluate the credibility of witnesses (*id.* at 16–17, 19). The state court must simply evaluate whether the record conclusively demonstrates that the hearing examiner's factual findings were support by competent substantial evidence (*id.* at 16–19). The Parole Commission contends that the record of Petitioner's revocation hearing demonstrates that there was competent substantial evidence that Petitioner intentionally made harassing phone calls to Ms. Johnston by repeatedly calling her after being told by her not to do so; therefore, the state court properly upheld the parole revocation (*id.* at 17–19).

To the extent Petitioner asserts a freestanding claim of actual innocence based upon his discovery of "new evidence," namely, the transcript of Ms. Johnston's answering machine tapes and evidence of her criminal record, he has not stated a cognizable claim for federal habeas relief. Neither the Supreme Court nor the Eleventh Circuit has recognized a freestanding claim of actual innocence in federal habeas corpus, especially in non-capital cases. *See* Herrera v. Collins, 506 U.S. 390 at 417, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (assuming, without deciding, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state avenue open to process such a claim"); House v. Bell, 547 U.S. 518, 554, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006) (declining to resolve the issue left open in Herrera whether freestanding innocence

claims are cognizable in federal habeas).  Therefore, to the extent Petitioner asserts a freestanding claim of actual innocence based upon the recently obtained transcripts of Ms. Johnston's answering machine tapes or other evidence, he has not stated a cognizable claim for relief.

Petitioner's claim may also be liberally construed as challenging the sufficiency of the evidence to support the parole revocation.  The state court record demonstrates that Petitioner exhausted this claim in the state courts.  Therefore, the court will review Ground One to the extent Petitioner claims that the parole revocation violated due process because there was insufficient evidence to support the revocation.

1.      Clearly Established Supreme Court Law

As an issue of federal law, Petitioner's claim of insufficiency of the evidence derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict.  Although the Supreme Court has not specifically held that the Due Process Clause requires sufficiency of the evidence in probation or parole violation proceedings, it has suggested this.  *See* Black v. Romano, 471 U.S. 606, 615–16, 105 S. Ct. 2254, 85 L. Ed. 2d 636 (1985) ("The decision to revoke Romano's probation satisfied the requirements of due process. . . . The courts below concluded, and we agree, that there was sufficient evidence to support the state court's finding that Romano had violated the conditions of his probation."); *see also* Douglas v. Buder, 412 U.S. 430, 93 S. Ct. 2199, 37 L. Ed. 2d 52 (1973) (probation revocation invalid under Due Process Clause where there was no evidentiary support for finding that probation conditions were violated). However, as recognized by the Eleventh Circuit, the Supreme Court has not established that due process in a parole or probation revocation proceeding requires proof beyond a reasonable doubt that the parolee committed the alleged violation.  *See* United States v. Taylor, 931 F.2d 842, 848 (11th Cir. 1991) (there is no requirement in a probation revocation hearing to prove beyond a reasonable doubt that the defendant committed the alleged acts; all that is required is that the evidence reasonably satisfy the judge that the conduct of the probationer has not been as good as required by the conditions of probation).  Indeed, the Supreme Court has not specifically stated the standard of proof that must be met in probation or parole revocation proceedings to satisfy the Due Process Clause.  *See, e.g.*, Black, 471 U.S. at 615–16 ("Bearden v. Georgia[, 461 U.S. 660, 666, and n.7, 103

S. Ct. 2064, 76 L. Ed. 2d 221 (1983)] recognized substantive limits on the automatic revocation of probation where an indigent defendant is unable to pay a fine or restitution.  We have no occasion in the present case, however, to decide whether concerns for fundamental fairness prohibit the automatic revocation of probation in any other context."); Douglas v. Buder, 412 U.S. 430, 93 S. Ct. 2199, 37 L. Ed. 2d 52 (1973) (probation revocation invalid under Due Process Clause where there was no evidentiary support for finding that probation conditions were violated).

Under Florida law, it is the hearing examiner's function to consider all the evidence presented, resolve conflicts, judge credibility of witnesses, draw permissible inferences from the evidence, and reach ultimate findings of fact.  Heifetz v. Department of Business Regulation, 475 So. 2d 1277, 1281 (Fla. 1st DCA 1985).  The Parole Commission is bound to accept the hearing examiner's findings if the findings are supported by competent, substantial evidence.  *See* Tedder v. Fla. Parole Comm'n, 842 So. 2d 1022, 1025 (Fla. 1st DCA 2003) (Commission is not at liberty to reweigh the evidence considered by the hearing examiner where the examiner's finding is supported by competent, substantial evidence); *see also* Richardson v. Fla. Parole Comm'n, 924 So. 2d 908 (Fla. 1st DCA 2006) (Commission improperly re-weighed evidence in rejecting examiner's conclusions instead of determining whether competent, substantial evidence supported examiner's findings).  If, as is often the case, the evidence presented supports two inconsistent findings, it is the hearing officer's role to decide the issue one way or the other.  Tedder, 842 So. 2d at 1025.

2.      Federal Review of State Court Decision

In Petitioner's state habeas petition, Petitioner challenged the sufficiency of the evidence to support the parole revocation (*see* Doc. 19, Ex. B).  The basis for Petitioner's parole revocation was Petitioner's failure to obey the law by making harassing phone calls to Virginia Baird Johnston by repeatedly calling her after she told him not to.

The Georgia harassing phone call statute states:

**§ 16-11-39.1. Harassing phone calls**

(a) A person commits the offense of harassing phone calls if such person telephones another person repeatedly, whether or not conversation ensues, for the purpose of annoying, harassing, or molesting another person or the family of such other person; uses over the telephone language threatening bodily harm; telephones and intentionally fails to hang up or disengage the connection; or knowingly permits any

> telephone under such person's control to be used for any purpose prohibited by this subsection.

O.C.G.A. § 16-11-39.1 (West). Under this criminal provision, one commits the offense of harassing phone calls if one telephones another person repeatedly "for the purpose of annoying, harassing, or molesting another person." *See* Moss v. State, 245 Ga. App. 811, 813 (Ga. App. 2000) (quoting O.C.G.A. § 16-11-39.1). No requirement exists that any conversation take place. *Id.*

The hearing examiner's written summary of the evidence adduced at the final parole hearing is included in Petitioner's parole record (Doc. 129-2, Ex K). Ms. Johnston, the recipient of the phone calls, testified that she and Petitioner dated from April or May through "the first of July," but on or about July 5, she told him to leave her alone and stop calling her (Doc. 129-2, Ex. K at 44–45). She testified that "that didn't work," and Petitioner continued calling her, despite her asking him not to do so (*id.*). She stated that his continuous calls upset her because her answering machine was always full and she could not get messages she wanted to get (*id.*). She testified that she changed her telephone number because Petitioner would not stop calling her, but within three days, Petitioner obtained her telephone number (*id.* at 44). She stated she was unsure how Petitioner obtained her new number, and when she inquired of Petitioner, he told her that he could get information about anybody (*id.*). When asked what Petitioner said when he called her, Ms. Johnston responded that she often did not speak to him, but when she did, he begged her "not to do what she was doing" (*id.* at 45). She stated that she learned he was on parole after she told him not to call her anymore (*id.*).

Ms. Johnston also testified that she and Petitioner began dating around Easter of 2000 (*id.*). She testified that Petitioner lived several hours away, but he visited her in Athens every other weekend, and when he did not visit, he called her and sent flowers and cards, which she did not find objectionable at that time (*id.*). Ms. Johnston acknowledged that she went to Destin, Florida, with Petitioner in June of 2000, and they stayed at a hotel on the beach (*id.*). She testified that when they planned the trip, she understood from Petitioner that they were going to stay in a hotel on the beach, but Petitioner's friend failed to obtain rooms on the beach, so she became upset and obtained herself a room on the beach (*id.*). She testified that she subsequently forgave him for this incident, and Petitioner visited her later in June (*id.*). Ms. Johnston testified that on one occasion in June, Petitioner came to Athens uninvited, which infuriated her, so she did not permit him to stay at her

apartment (*id.*). She testified that around the beginning of July, their relationship changed (*id.*). She stated that Petitioner's phone calls were continuous, and even though he said he would not call as often, he kept on doing it, so she told him she "had enough" and "just leave me alone please" (*id.*). She stated she asked the manager of her apartment complex to intercept Petitioner if he attempted to visit her, and although she did not observe Petitioner at the complex after that, she was told that he had appeared there and called the management office numerous times (*id.* at 44–46). When asked if Petitioner ever accosted her, Ms. Johnston responded that he "never did anything like that," he just "drove [me] crazy on the telephone" (*id.* at 46).

When asked whether it was true that between July 1–5, Petitioner visited her in Athens, and the two of them "were on good terms," Ms. Johnston responded that if Petitioner visited her in July, they "were not on good terms" (*id.* at 47). Ms Johnston testified that after she told Petitioner not to call her anymore, he came to Athens and went to her church, but she did not attend services that day (*id.* at 45). She testified that Petitioner called her after church and then wanted her to go to lunch with him (*id.* at 46). She stated that he "called and talked and talked and talked, hung up and then called back and filled the machine up" (*id.*). She testified there were messages recorded on her answering machine tape from his repeated phone calls, during which he asked her to pick up the phone and talk to him (*id.*). When asked if the gist of Petitioner's phone calls was to find out "what was going on" and persuade her to continue the relationship, Ms. Johnston responded "yes" (*id.*). She stated that even during their relationship she told him to quit calling her continuously, but it continued until she "had enough" (*id.*). Petitioner's counsel asked Ms. Johnston if she initiated calls to Petitioner, and counsel produced telephone records from Ms. Johnston's new telephone number, beginning on July 11, at the hearing (*id.* at 46, 49). Ms. Johnston admitted that she may have initiated calls to Petitioner, but stated the purpose of her calls was to tell Petitioner to quit calling her (*id.* at 46). Ms. Johnston described Petitioner as possessive and compulsive (*id.*). She stated that she did not request that the Georgia criminal charges against Petitioner for making harassing phone calls and stalking be dropped, but the prosecutor decided not to prosecute the charges so Petitioner could be returned to Florida (*id.* at 45).

Petitioner's counsel then asked Ms. Johnston if she took any medication to treat depression (*id.* at 47). She responded that she did not, but she took medication for seizures (*id.*). When asked if she suffered from memory lapses, she responded by stating that she does not miss "blocks of time," but she may forget a period of fifteen seconds (*id.*). Petitioner's counsel asked her why she could not remember the July 4th weekend, and she responded that she "doesn't remember that far back" (*id.*) (Petitioner's final hearing was January 24, 2001, more than six months later). Petitioner's counsel also asked Ms. Johnston if she told Detective Cole that she went to Destin with a girlfriend, instead of Petitioner (*id.* at 47). Ms. Johnston responded that she told Detective Cole that "there was a girl involved" (*id.*).

Detective Ivey testified that he met with Ms. Johnston on July 27, 2000, at her home (*id.* at 47). He testified that during that meeting, Ms. Johnston showed him her "caller ID," which showed calls beginning on July 22, 2000, a phone call on July 26, 2000, and several calls on July 27, 2000 (*id.* at 47–48). Detective Ivey also testified that Ms. Johnston's mother came to Ms. Johnston's house while he was there and gave him an answering machine tape (*id.* at 47). Ms. Johnston gave him items she had received from Petitioner since she told him not to contact her, including a box of flowers, letters, and packages (*id.* at 47–48). Detective Ivey testified that he did not recall that the nature of the letters or packages was threatening or intimidating, but they were harassing in nature because of the repeated contact (*id.* at 48). Detective Ivey's five-page police report was not admitted as evidence, but was included in Petitioner's parole record (Doc. 153 at 9; Doc. 129-2, Ex. K at 53–60).[3]

Detective Cole also testified at the revocation hearing. He testified that he began investigating Ms. Johnston's complaint of harassing phone calls in July of 2000, and his investigation extended into August (*id.* at 48). He testified that Ms. Johnston told him that on July 5, she told Petitioner that she did not want to see him anymore, and on July 10, she changed her phone number because he continued to call her (*id.*). According to Petitioner's partial transcript of

---

[3] The report included Detective Ivey's observations of dates, times, and telephone numbers of incoming calls on Ms. Johnston's "caller ID," which included three calls from the 912 area code, one on July 22 and two on July 27 (Doc. 129-2, Ex. K at 56). The report also included a transcript of taped messages on Ms. Johnston's answering machine from a caller whom she identified as Petitioner (*id.* at 59–60).

the final hearing, Detective Cole testified that Ms. Johnston's phone records "did not indicate specifically that Mr. Van Zant made those repeated calls" (*see* Doc. 12-1 at 34). The hearing examiner asked, "So you're saying that what you have could not specifically show that it was from Phillip Van Zant. That's what you said there?" (*id.* at 35), and Detective Cole responded, "That's right" (*id.*).

Lafreda Baird, Ms. Johnston's mother, testified at the final hearing. She testified that she recalled seeing Petitioner at her daughter's apartment, but could not remember if it was the weekend of July 4 (Doc. 129-2, Ex. K at 48). She testified that Petitioner "could not accept no for an answer," and she told him that he needed to "get on with his life" and leave her daughter alone (*id.*).

Petitioner testified on his own behalf. He presented the hearing examiner with a letter from Mr. Norman Haley, Petitioner's counsel during the preliminary parole proceedings, in which Mr. Haley stated that a person named "Kane" told him (Haley) that he saw Petitioner open Ms. Johnston's apartment door with a key on July 4, 2000, thus supporting Petitioner's contention that he was Ms. Johnston's houseguest that weekend (*id.* at 47). Petitioner admitted that he called Ms. Johnston on July 9 (the day he went to her church and then called her to invite her to lunch) (*id.* at 49). Petitioner submitted copies of two money orders he paid to Ms. Johnston, dated June 30, 2000, in the amount of $200.00 and July 17, 2000, in the amount of $100.00, which she cashed (*id.*). Petitioner testified that Ms. Johnston's telephone records showed no phone calls from his area code, but the records showed phone calls from her to him (*id.*). The hearing examiner noted that the telephone records began on July 11 and showed that Ms. Johnston called Petitioner's telephone number in Wray, Georgia, (912) 359-3556, on July 18, July 19, and July 24, 2000 (Doc. 129-2, Ex. K at 49; Doc. 12-2 at 1–17). The hearing examiner also noted that there were a number of phone calls to Ms. Johnston's number from a calling number identified as all zeros (Doc. 129-2, Ex. K at 49; Doc. 12-2 at 1–17). Petitioner testified that he did not call Ms. Johnston with the intent to annoy or harass her, and he wished to take a polygraph examination to prove this (Doc. 129-2, Ex. K at 49). Petitioner pointed out the following areas in Ms. Johnston's testimony that showed she was prone to exaggeration: (1) at the preliminary hearing she testified that she lost a kidney and was in a coma for six months as a result of a horse riding accident, but her mother testified that she did not lose a

kidney and she was in a coma for only a couple of days; and (2) Ms. Johnston told Detective Cole that she went to Destin with a girlfriend, when, in fact, she went with Petitioner (*id.*).

At the request of Petitioner's counsel, the final hearing was reconvened five months later to enable Petitioner to take a polygraph examination and counsel to obtain copies of credit card records and checks from Ms. Johnston (Doc. 129-2, Ex. K at 50). At the continued hearing on July 28, 2001, Petitioner's counsel presented testimony from Arney Herrin, a polygraph examiner, although the parole record includes only a letter from Mr. Herrin to Petitioner's counsel describing the results of the examination, as well as a report of the results (*id.* at 63–65). According to the letter, Mr. Herrin asked Petitioner, "Did you lie about making harassing phone calls to Virginia Johnston on or about July 5?" (*id.* at 64). Petitioner answered "No" and told Herrin that during the time of July 5, he and Ms. Johnston were at the beach on vacation (*id.*). Petitioner told Mr. Herrin that after the vacation, he tried to call Ms. Johnston several times but not to harass her (*id.*). Mr. Herrin did not see any physiological indications of deception in Petitioner's answer to the question (*id.* at 63, 64). Mr. Herrin also asked Petitioner, "Did you even lie about telling Virginia Johnston that she ought to be dead or that you ought kill [sic] her?" (*id.* at 64). Petitioner apparently answered "No" (*id.*). Mr. Herrin did not see any physiological indications of deception in Petitioner's answer to the question (*id.* at 63, 64).

The hearing examiner's summary included several documents submitted as exhibits at the final hearing. One document is an entry of nolle prosequi filed by the Athens-Clarke County prosecutor in the criminal case filed against Petitioner for stalking and making harassing phone calls (Doc. 129-2, Ex. K at 52). Additionally, Petitioner submitted affidavits from his mother and brother, which were also included as exhibits (*see* Doc. 129-2, Ex. K at 43; Doc. 12-1 at 12, 13). Petitioner's mother stated that Petitioner stayed with Ms. Johnston as her guest from July 1–5, 2000; that Petitioner lived with her (his mother) from July 9–27, 2000, and was at work every weekday and at home every night and weekend during that time; and that Ms. Johnston called her (Ms. Van Zant's) home on July 24 and asked her to tell Petitioner that she had called (Doc. 12-1 at 12). Petitioner's brother stated that he lived with his mother and Petitioner from July 9–27; that Petitioner was at work every day and at home every night and weekend during that time; and that on July 19, 2000,

he answered the telephone, and Ms. Johnston asked to speak to Petitioner, so he summoned Petitioner to the phone (*id.* at 13). Additional exhibits included the following: (1) Certificate of Parole, (2) Parole Commission's Warrant, (3) Notice of Hearing, (4) a letter from Petitioner's counsel dated January 12, 2001, requesting that the final hearing be postponed, (5) checks requested from Ms. Johnston, (6) VISA records requested from Ms. Johnston, (7) copies of money orders to Ms. Johnston, and (8) a letter to Petitioner's counsel from Arney Herrin, the polygraph examiner, and written test results from the polygraph examination (*see* Doc. 129-2, Ex. K at 43).

The hearing examiner's summary included several factual findings. The hearing examiner found that Petitioner made repeated telephone calls to Ms. Johnston with the intent to harass her (*see* Doc. 129-2-2, Ex. K at 50). In making this finding, the hearing examiner implicitly, if not explicitly, found Ms. Johnston's testimony credible that on or about July 4 or 5, she asked Petitioner to quit calling her, and he continued to call her, filling up her answering machine and causing her to change her telephone number (*id.*). The hearing examiner also found Detective Cole's testimony credible that Ms. Johnston told him that on July 5, she told Petitioner that their relationship was over, and she was forced to change her telephone number on July 10, 2000, due to the number of phone calls from Petitioner (*id.*). The hearing examiner implicitly discredited Petitioner's testimony that he did not call Ms. Johnston for the purpose of harassing her.

The Parole Commission adopted these findings, including the hearing examiner's credibility determinations and findings of specific intent, thereby concluding that the findings were supported by competent, substantial evidence (*see* Doc. 19-1, Ex. A). Based upon these findings, the Parole Commission determined that the preponderance of the evidence showed that Petitioner violated Condition 7 of his parole, which required him to obey all laws, by unlawfully making harassing phone calls to Ms. Johnston (*id.*). Upon review of the Parole Commission's decision by the state court, the state court concluded that there was competent, substantial evidence to support the Parole Commission's decision (Doc. 12, Ex. C). In its written opinion, the state court made the following determinations:

> The attachments to Petitioner's complaint show that the Florida Parole Commission revoked Petitioner's parole for having failed to obey all laws, ordinances or statutory conditions by making harassing phone calls to a certain individual. Through a Parole

Revocation Hearing, the Commission chose to revoke Petitioner's parole based on sworn testimony by the alleged harassed individual, as well as by considering testimony of a detective involved with the situation. Petitioner has failed to convince this Court that the Commission abused its discretion.

(Doc. 19, Ex. C).

The state court did not specifically cite to any United States Supreme Court case for the standard to be applied in resolving Petitioner's claim. However, a state court is not required to cite United States Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). Petitioner has not shown that the state court reached an opposite conclusion from the United States Supreme Court on a question of law. Furthermore, Petitioner has not identified any United States Supreme Court case with a set of materially indistinguishable facts that was decided differently from his case, nor is the court aware of any such case. Therefore, Petitioner has failed to show that the state court's decision was contrary to Supreme Court law.

Additionally, Petitioner has failed to show that the state court's decision was based upon an unreasonable determination of the facts or constituted an unreasonable application of clearly established federal law. The hearing examiner found as fact that on or about July 5, 2000, Ms. Johnston told Petitioner not to call her. The evidence supporting this finding included sworn testimony from Ms. Johnston herself that "somewhere around" July 4 or 5 she asked Petitioner not to call her (see Doc. 129-2, Ex. K at 44). Petitioner contends that the following evidence impeached Ms. Johnston's credibility: (1) evidence that Petitioner was Ms. Johnston's houseguest from July 1–5, (2) Ms. Johnston's phone records showing that she called Petitioner on July 18, July 19, and July 24, which was after she told Petitioner not to call her, and (3) a copy of a money order showing that Ms. Johnston accepted $100.00 from Petitioner on July 25. Despite Petitioner's argument to the contrary, this evidence does not clearly refute Ms. Johnston's testimony that on July 5, the last day of Petitioner's visit, she told him not to call her anymore. Furthermore, during the hearing, the hearing examiner heard firsthand Ms. Johnston's testimony and was able to observe her demeanor while she testified, which enabled him to attach significance to her testimony based upon her perceived credibility. The hearing examiner apparently accorded weight to her testimony that on

July 5, she told Petitioner not to call her anymore, despite evidence that Petitioner visited her during the July 4 weekend. As Petitioner has failed to present clear and convincing evidence to rebut the hearing examiner's assignment of credibility to Ms. Johnston's testimony or to rebut the examiner's factual finding that on or about July 5, Ms. Johnston asked Petitioner to stop calling her, this factual finding by the hearing examiner is presumed correct.

The hearing examiner also found that Petitioner repeatedly called Ms. Johnston after July 5, 2000, the date she told him not to call her anymore. The evidence supporting this finding included Ms. Johnston's testimony that on July 5, she told Petitioner to leave her alone and stop calling her; that Petitioner continued calling her after that date; that she could hear Petitioner's voice when he left messages on her machine, but she did not answer the calls; that on July 9, Petitioner "called and talked and talked and talked, hung up and then called back and filled the machine up," and that on July 10, she changed her telephone number because Petitioner would not stop calling her. The hearing examiner apparently accorded credibility to this testimony. Furthermore, contrary to Petitioner's contention, this testimony was not refuted by Ms. Johnston's telephone records. Although her telephone records do not reflect repeated phone calls from Petitioner's home number (or any number in his 912 area code) to Ms. Johnston's new number for the period July 11–26 (the period reflected in the phone records), the phone records do not clearly refute Ms. Johnston's testimony that Petitioner made repeated calls to her old telephone number after July 5, the date she told him never to call her, and before she changed her phone number on July 10. Petitioner has failed to present clear and convincing evidence to rebut the hearing examiner's finding that Petitioner repeatedly called Ms. Johnston after July 5, 2000; therefore, this factual finding is presumed correct.

The hearing examiner additionally found that Petitioner intentionally made harassing phone calls to Ms. Johnston. The evidence supporting this finding included Ms. Johnston's testimony that on July 5, she told Petitioner not to call her anymore, yet he continued to call her with such frequency that she changed her telephone number. Ms. Johnston additionally testified that after she changed her number, Petitioner called her on the new number, and when she asked him how he obtained her new number, he told her that a friend of his could get any information about anything. Ms. Johnston testified that even during their relationship, she told him that his continuously calling

her annoyed her (*see* Doc. 129-2, Ex. K at 46). This testimony suggests that the purpose of Petitioner's repeated telephone calls to Ms. Johnston was to harass her, as it shows: (1) Petitioner knew that his continuous phone calls annoyed Ms. Johnston, (2) he continued to call her despite this knowledge, (3) he continued to call her with such frequency that she changed her phone number, and (4) he then obtained her new number from a third party and continued to call her.

Petitioner argues that the following evidence shows that he did not intend to harass Ms. Johnston, rather, he called to inform her of an emergency, attempt to salvage their relationship, and find out "what was going on": (1) the transcript of Ms. Johnston's answering machine tapes, which shows that he left three messages requesting that she return his call on Monday at 9:33 p.m., 9:43 p.m., and 9:51 p.m., and that he called her collect four times from the county jail on Thursday, July 27 at 10:33 a.m., 10:40 a.m., 10:49 a.m. and 1:08 p.m. (*see* Doc. 129-2, Ex. K at 59–60; Doc. 149 at 11–12, 17), (2) Ms. Johnston's admission that the thrust of Petitioner's phone calls was to persuade her to continue the relationship (*see* Doc. 129-2, Ex. K at 46), and (3) the results of the polygraph examination, which showed that there were no indications of deception when Petitioner answered "No" to the question, "Did you lie about making harassing phone calls to Ms. Johnston on or about July 5th?" (*see* Doc. 149 at 17; Doc. 129-2, Ex. K at 63–65). Additionally, Petitioner apparently testified at the final hearing that he did not call Ms. Johnston with the intent to annoy or harass her (*see* Doc. 129-3, Ex. K at 49). The evidence identified by Petitioner does not clearly and convincingly refute the hearing examiner's finding that Petitioner intentionally made harassing phone calls to Ms. Johnston. Therefore, the hearing examiner's finding that Petitioner intended to harass Ms. Johnston is presumed correct.

In light of the hearing examiner's findings and the record before the Parole Commission, there was sufficient evidence to support the parole revocation based upon Petitioner's failure to obey the law. *See* Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979) (on review of sufficiency of the evidence claim, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found evidence to support the charged violation under the applicable standard of proof). Therefore, Petitioner has failed to demonstrate that the state court's adjudication of his claim was contrary to

or an unreasonable application of Supreme Court precedent, or that the decision was based upon an unreasonable determination of the facts in light of the evidence presented. Accordingly, he is not entitled to federal habeas relief on this claim

      B.     Ground Two: "Denied Equal Protection of Law."

Petitioner contends other Georgia residents were protected from losing their liberty as a result of violating Georgia's harassing phone call statute, O.C.G.A. § 16-11-39, by the requirement that all essential elements of the statute be satisfied, but his liberty was taken without evidence that he called Ms. Johnston repeatedly for the purpose of harassing her. Petitioner contends this unequal application of the law violated the Equal Protection Clause (Doc. 1 at 6, 10; Doc. 12 at 17).

The Parole Commission did not address whether Petitioner exhausted this claim in the state courts. The Commission contends Petitioner's constitutional claim is without merit because he failed to show he was similarly situated with other persons (*see* Doc. 129 at 19–20).

Regardless of whether Petitioner exhausted this claim in the state courts, his claim is without merit. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). "To establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." Sweet v. Secretary, Dept of Corrections, 467 F.3d 1311, 1318–19 (11th Cir. 2006) (citing Jones v. Ray, 279 F.3d 944, 946–47 (11th Cir. 2001) and Damiano v. Florida Parole and Prob. Comm'n, 785 F.2d 929, 932–33 (11th Cir. 1986)).

In the instant case, the record demonstrates that Petitioner was not similarly situated with other residents of Georgia. Petitioner was on parole and was required to obey specific conditions that all other Georgia residents were not required to obey. As a consequence of being on parole, he was subject to losing his liberty if there was competent, substantial evidence that he violated any condition of his parole, including the condition that he not violate any law. Other Georgia residents were subject to losing their liberty only if there was evidence proving beyond a reasonable doubt that they violated the law. Petitioner has thus failed to show he was similarly situated to other Georgia

residents. Additionally, Petitioner's contention in his reply brief that he was similarly situated with Jack F. Durie, Jr., the probationer in <u>Durie v. State</u>, 901 So. 2d 171 (Fla. 5th DCA 2005), is unconvincing. The evidence adduced at Mr. Durie's probation revocation hearing is not similar to the evidence adduced at Petitioner's parole revocation hearing.[4] Furthermore, an essential element of a violation of the Florida harassing phone call statute under which Durie was charged was that conversation ensued, whereas an ensuing conversation was not an essential element of the Georgia harassing phone call statute. Therefore, Petitioner has failed to demonstrate that he was treated differently than other Florida parolees who were similarly situated. Furthermore, Petitioner does not allege that he was treated differently on account of invidious discrimination tied to a constitutionally protected interest such as race, religion, or national origin. *See* <u>Snowden v. Hughes</u>, 321 U.S. 1, 8, 64 S. Ct. 397, 88 L. Ed. 497 (1944) ("The unlawful administration . . . of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial

---

[4] In <u>Durie</u>, the probationer was charged with violating his probation by violating Florida's harassing phone call statute, Florida Statutes § 365.16(1)(d), which provided that whoever "makes repeated telephone calls, during which conversation ensues, solely to harass any person at the called number" is guilty of a misdemeanor. *See* Fla. Stat. § 365.16(1)(d). The relevant facts are that Mr. Durie personally called Assistant Attorney General Angela McCravy at her office and was told by her secretary that Ms. McCravy could not accept the call because Mr. Durie was represented by counsel in the criminal matter in which Mr. Durie was involved at the time. 901 So. 2d at 173. Mr. Durie subsequently left three successive five-minute messages on Wednesday, August 29, 2001, at 1:43 p.m., 1:49 p.m., and 2:08 p.m., on Ms. McCravy's voice mail. *Id.* From the transcripts of these calls, it was apparent that Mr. Durie called three times, at least in part, because the automatic voice mail system disconnected the phone call after several minutes of recording. *Id.* The messages consisted of legal arguments professing his innocence of a charge, punctuated by unflattering words maligning Ms. McCravy's ethics and legal work. *Id.* Mr. Durie stated he intended to file a Florida Bar complaint and threatened that his case would come back to haunt Ms. McCravy for the rest of her life. *Id.* Ms. McCravy listened to the voice mail messages and reported them to the police. *Id.* The trial court dismissed Mr. Durie's argument that his intent was not solely to harass by pointing out that Mr. Durie, an attorney himself, knew that attorneys were ethically prohibited from communicating about a client's case with persons represented by counsel without permission of that person's counsel. *Id.* at 176. The court then convicted Mr. Durie of violating the condition of his probation requiring to obey all laws, based upon his violation of the harassing phone call statute. *Id.* at 176–77.

The appellate court determined that the trial court erred as a matter of law in misinterpreting the harassing phone call statute as including a requirement that Durie show that his intent to persuade, instead of or in addition to his intent to harass, was legitimate. *Id.* at 177. Furthermore, the appellate opined that although there was little question Mr. Durie knew that the messages would upset and threaten Ms. McCravy, the messages contained extensive legal and rational discussion in which Durie was trying to explain his view of the entire matter, which demonstrated that Durie was motivated at least in part by a desire to convince Ms. McCravy that he had been unjustly convicted. *Id.* at 176. In light of the trial court's misinterpretation of the law, as well as the evidence that at least part of Durie's intent was to persuade, there was not competent, substantial evidence that supported a determination that Mr. Durie's intent was solely to harass. *Id.* at 174–75. The appellate court therefore reversed the order revoking Durie's probation. *Id.* at 177.

of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."); Sweet, 467 F.3d at 1319 (affirming dismissal of petitioner's equal protection claim because petitioner failed to establish that he was treated differently from similarly situated prisoners or that he was treated differently on account of invidious discrimination); *see also* Cruz v. Skelton, 543 F.2d 86, 92-93 (5th Cir. 1976) (affirming dismissal of prisoner's equal protection claim because there was no allegation of "'invidious discrimination' based on such considerations as race, religion, national origin, or poverty"). Accordingly, Petitioner has failed to demonstrate that the revocation of his parole violated the Equal Protection Clause.

    C.    Ground Three: "Denied Due Process Right to Have Witnesses Subpoenaed in Violation of the 6th & 14th Amendment[s]."

Petitioner states that before the preliminary and final revocation hearings, he requested that the following witnesses be subpoenaed to appear in his defense: (1) Dr. David Jarret, a psychiatrist, (2) Dr. Van Morris, a neurologist, (3) Mr. Larry Steyerman, (4) Mr. Kane, and (5) Mrs. Kane (Doc. 1 at 10–12). Petitioner states Dr. Jarret and Dr. Van Morris could have testified about Ms. Johnston's temporal lobe brain damage and her "mental diagnosis," which would have shed light on her propensity to fabricate and explain why she accused Petitioner of making harassing phone calls (*id.* at 11; Doc. 12 at 18–23; Doc. 149 at 26–27). Petitioner states Mr. Steyerman spoke to Ms. Johnston immediately before and after her discovery on July 26, 2000, that Petitioner was on parole and could have testified to Ms. Johnston's "hysterical reaction" to the news (Doc. 1 at 11; Doc. 149 at 27). Petitioner states this testimony would show Ms. Johnston's motivation for falsely accusing him of making harassing phone calls (Doc. 1 at 11; Doc. 149 at 27). Petitioner asserts that Mr. and Mrs. Kane would have verified that Petitioner was Ms. Johnston's house guest on July 5, 2000 (Doc. 1 at 11; Doc. 149 at 26–27).

The Parole Commission did not address whether Petitioner exhausted this claim in the state courts. The Commission contends Petitioner's due process claim is without merit (*see* Doc. 129 at 20–22).

The Supreme Court has held that the following minimum requirements of due process must be accorded to a parolee or probationer in a revocation proceeding:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

Morrissey v. Brewer, 408 U.S. 471, 488–89, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). "These requirements in themselves serve as substantial protection against ill-considered revocation." Gagnon v. Scarpelli, 411 U.S. 778, 787, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973). A revocation hearing does not "equate . . . to a criminal prosecution in any sense," thus, the parolee is not entitled to "the full panoply" of due process rights to which a criminal defendant is entitled. Morrissey, 408 U.S. at 489–90. The final revocation proceeding "is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." Id. at 489.

As Petitioner acknowledges, and as evidenced by the Notice of Rights at Final Revocation Hearing form signed by him on December 19, 2000, prior to the final revocation hearing, the hearing examiner, Mr. Willis, notified Petitioner of his rights, including the right to obtain witnesses to appear in his behalf and request that the Parole Commission issue subpoenas for the attendance of those witnesses (see Doc. 129-2, Ex. K at 39). In the space provided on the Notice of Rights at Final Revocation Hearing form for Petitioner to list witnesses he desired to be subpoenaed for his hearing, there is no mention of Dr. David Jarret, Dr. Van Morris, or Mr. Larry Steyerman (see id.); however, Petitioner's partial transcript of the pre-hearing meeting with Mr. Willis on December 19 shows that Petitioner requested that Dr. Jarret, Mr. Steyerman, and Mr. Kane be subpoenaed for the final hearing (see Doc. 149 at 24–25).[5]

It is undisputed that after the pre-hearing meeting, the Parole Commission appointed Attorney Replogle as counsel to represent Petitioner. Petitioner does not allege, nor is there any

---

[5] According to the partial transcript, Petitioner also requested that the Parole Commission subpoena the attorney who represented him at the preliminary hearing, Mr. Norman Haley, as well as his mother and brother, Lena and Roy Van Zant (see Doc. 12 at 20, Appendix at A53–55); however, none of these witnesses are the subject of Ground Three.

indication in the record, that Attorney Replogle requested issuance of subpoenas for any of these witnesses, or that the Parole Commission in any way prevented Petitioner's counsel from presenting testimony of Dr. Jarret, Dr. Morris, Mr. Steyerman, Mr. Kane, Mrs. Kane, or any other witnesses. Indeed, the hearing examiner continued the hearing from January to June, at Attorney Replogle's request, to provide counsel additional time to collect and present additional evidence. There is no evidence that counsel sought issuance of subpoenas for these witnesses during the five-month continuance or that the Parole Commission denied any such request. Therefore, Petitioner has failed to demonstrate a violation of Morrissey.

Furthermore, to the extent Petitioner contends the Parole Commission failed to comply with provisions of Florida law, including the Florida Administrative Code (*see* Doc. 12 at 18–20; Doc. 149 at 23–24), this argument does not provide a basis for federal habeas relief. A violation of a state statute or rule of procedure is not, in itself, a violation of the federal constitution. *See* Engle v. Isaac, 456 U.S. 107, 119, 102 S. Ct. 1558, 1567, 71 L. Ed. 2d 783 (1982); Branan v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1989). Thus, the fact that Florida Statutes or the Florida Administrative Code may require more process during revocation hearings than Morrissey is of no import to the instant lawsuit. *See, e.g.*, Harris v. Crosby, No. 1:04cv22/MP/AK, 2007 WL 963168, at *4 (N.D. Fla. Mar. 27, 2007) (habeas petitioner not entitled to relief on claim that Florida Administrative Code required disclosure of evidence prior to final revocation hearing because Morrissey did not require such, and habeas claim grounded on issue of state law alone provided no basis for federal habeas relief). Therefore, Petitioner has failed to show that the Parole Commission violated his due process rights recognized in Morrissey.

D.    Ground Four:  "Denied Due Process Right to be Presented with the Evidence in Violation of the 6th & 14th Amendment[s]."

Petitioner states that during the pre-hearing interview by hearing examiner Mike Willis on December 19, 2000, Petitioner asked Mr. Willis to subpoena Ms. Johnston's checkbook for July of 2000, because it contained a carbon copy of a check she wrote to Petitioner on July 5, 2000, which proved he was her houseguest on that date (Doc. 1 at 11, 14; Doc. 12 at 24–25). Petitioner concedes that the hearing examiner asked Ms. Johnston to bring her checkbook for July of 2000 to the revocation hearing, and she apparently brought her cancelled checks; however, she omitted a check

she wrote to Petitioner on July 5, 2000 (*see* Doc. 149 at 29). Petitioner states this check would have proved that they were together that day, thereby proving that he did not make harassing phone calls to her that day and discrediting Ms. Johnston's testimony that she and Petitioner "were not on good terms" in July of 2000 (*id.*). Petitioner argues the Parole Commission should have subpoenaed the carbon copies of Ms. Johnston's checks, which would have included the copy of the check she failed to produce at the hearing (*id.*). Petitioner additionally contends the hearing officer should have required Ms. Johnston to produce the tapes from her answering machine, and the failure to do so deprived him of the ability to prove that he was not calling her (*id.* at 14).

The Parole Commission again chose not to address whether Petitioner exhausted this claim in the state courts. The Commission contends Petitioner's due process claim is without merit (*see* Doc. 129 at 20–22).

The Parole Commission's failure to subpoena the carbon copies of Ms. Johnston's checkbook did not violate the constitutional due process requirements articulated in <u>Morrissey</u>. As previously noted, Petitioner was represented by counsel at the final hearing. The hearing summary shows that at the final hearing on January 24, 2001, Petitioner's counsel requested that the hearing be continued to allow him to obtain additional evidence, including records of Ms. Johnston's checkbook and credit card activity, as well as a polygraph examination of Petitioner (*see* Doc. 129-2, Ex. K at 50). The examiner granted the request, and the hearing resumed on June 28, 2001 (*id.* at 43). When the hearing reconvened, Petitioner's counsel submitted additional evidence. The fact that Petitioner's counsel did not submit or seek to obtain the carbon copy of Ms. Johnston's checkbook does not equate to the Parole Commission's preventing him from doing so or otherwise depriving him of the opportunity to present evidence in Petitioner's behalf.

As for the answering machine tapes, Petitioner did not request production of this evidence on the Notice of Hearing form, nor does the partial transcript of Petitioner's pre-hearing meeting with the hearing examiner on December 19 show that Petitioner requested production of the tapes. Furthermore, Petitioner's counsel had access to the transcript of the tapes, as evidenced by the fact that the transcript was included in Detective Ivey's police report, which was included in Petitioner's parole file on January 5, 2001, prior to the final hearing on January 24, 2001 (*see* Doc. 129-2, Ex.

K at 59–60; Doc. 152 at 2, Appendix at A-4). Although Petitioner alleges that prior to the final hearing, his counsel "requested all evidence in this case" (*see* Doc. 149 at 36–37), Petitioner does not allege that his counsel was denied the opportunity to review Detective Ivey's report at the final hearing on January 24, 2001, or during the five-month period between that date and the date of the continued final hearing on June 28, 2001. Therefore, Petitioner has failed to show that the Parole Commission denied him the right to present evidence.

To the extent Petitioner contends the Parole Commission violated his right to disclosure of the evidence against him by failing to provide him the answering machine tapes or the transcript thereof, he has failed to demonstrate a due process violation. The Parole Commission states that evidence of the content of the answering machine tapes was not admitted as evidence at the final hearing (*see* Doc. 153 at 9), and Petitioner has not shown otherwise. Therefore, Petitioner has failed to show that the Parole Commission's failure to provide him the answering machine tapes or the transcript violated *Morrissey*.

Finally, to the extent Petitioner contends the Parole Commission failed to comply with provisions of Florida law, including the Florida Administrative Code, governing the presentation of evidence at parole revocation hearings (*see* Doc. 12 at 24; Doc. 149 at 28–30), this argument does not provide a basis for federal habeas relief, as discussed *supra*.

E. <u>Ground Five: "Hearing Examiner Withheld Exculpatory Evidence From the Final Hearing Summary Report that the Parole Commission Relies On as the Final Decisionmaker to Determine Whether or not to Revoke or Reinstate Parole, which Violated Petitioner's Due Process Right to Present Evidence in Violation of the 6th and 14th Amendment[s]."</u>

Petitioner contends the hearing examiner failed to include certain evidence in the hearing summary, including, (1) Ms. Johnston's telephone records, (2) testimony from Lafreda Baird that Petitioner was Ms. Johnston's houseguest from July 1–5, 2000, (3) Ms. Johnston's testimony that she gave Petitioner a key to her apartment on July 4, 2000, (4) Ms. Johnston's testimony that she ordered dinner for Petitioner and herself from Logan's Roadhouse on July 5, 2000, and gave Petitioner her credit card to pay for it, as verified by her credit card records submitted as evidence at the hearing, and (5) testimony from Arnie Herrin, the polygraph examiner (Doc. 1 at 15–16; Doc. 12 at 26–28).

As with Grounds Two through Four, the Parole Commission did not address whether Petitioner exhausted this claim in the state courts. The Commission contends Petitioner's constitutional claim is without merit (*see* Doc. 153 at 2–4).

In Petitioner's reply brief and his "Supplemental Pleading" (Docs. 149, 152), Petitioner adds a new argument that the Athens-Clarke County Police Department and the Parole Commission violated his due process rights under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, L. Ed. 2d 215 (1963), in which the Supreme Court held that suppression by the prosecution of evidence favorable to the defense violates due process when the evidence is material to guilt or punishment (Doc. 149 at 33–38; Doc. 152). Petitioner asserts that the Athens-Clarke County Police Department failed to disclose to Petitioner or his counsel that it possessed Ms. Johnston's answering machine tapes and a transcript of those tapes, even though Mr. Haley, Petitioner's counsel at the preliminary hearing, requested all evidence from the police department and the Parole Commission prior to the preliminary hearing (*see* Doc. 149 at 33–36). Petitioner asserts that prior to the final hearing on January 24, 2001, Attorney Replogle, his counsel for the final revocation proceedings, also "requested all evidence in this case," but the Parole Commission failed to produce the transcript of the answering machine tapes (*id.* at 36–37).

Regarding Petitioner's claim that the hearing examiner failed to include all evidence in the hearing summary, Morrissey does not require the factfinder to provide a verbatim recitation of every bit of evidence, testimonial or documentary, adduced at the revocation hearing. Morrissey simply requires a written statement by the factfinder as to the evidence relied on and reasons for recommending a revocation of parole. *See* Glumb v. Honsted, 891 F.2d 872, 873–74 (11th Cir. 1990) (citing Morrissey, 408 U.S. at 481). The hearing examiner's summary in the instant case satisfies that requirement. Therefore, Petitioner has failed to demonstrate that the exclusion of Ms. Johnston's telephone records, testimony from Ms. Baird and Ms. Johnston that Petitioner was Ms. Johnston's houseguest from July 1–5, 2000, and testimony from the polygraph examiner from the hearing summary violated due process. Moreover, the hearing summary included Petitioner's testimony that Ms. Johnston's telephone records indicated no phone calls to her from his area code and indicated phone calls from her to him. Additionally, the hearing examiner described the phone

records as starting on July 11 and showing several calls from Ms. Johnston to Petitioner's area code, as well as calls made to Ms. Johnston from a phone number identified in the phone records as all zeros. The hearing summary also included Petitioner's cross-examination of Ms. Johnston regarding Petitioner's visit with her during the July 4th weekend, including Ms. Johnston's near admission that such a visit occurred (when Petitioner testified that he picked up football jerseys for Ms. Johnston on July 5, Ms. Johnston responded by stating, "that was fine, but that doesn't prove anything" (*see* Doc. 129-2, Ex. K at 47)), and the summary also included Ms. Johnston's VISA records, which Petitioner states verified that he was her guest on July 5. Finally, the hearing summary included the report of the polygraph examiner and his written description of the results of the polygraph in a letter to Petitioner's counsel. Therefore, Petitioner has failed to demonstrate that the hearing examiner's failure to include a verbatim recitation of every bit of testimonial and documentary evidence in the hearing summary violated his due process rights under <u>Morrissey</u>.

Petitioner's <u>Brady</u> claim, is also without merit. Parole revocation proceedings are not subject to the strictures of <u>Brady</u>. *See* <u>United States v. Ataya</u>, 145 Fed. Appx. 331, 333 n.2, 2005 WL 1371319, at *2 n.2 (11th Cir. 2005) (unpublished) (<u>Brady</u> only applies to criminal prosecutions and not to probation revocation hearings) (citing <u>Gagnon v. Scarpelli</u>, 411 U.S. 778, 782, 93 S. Ct. 1756, 1759–60, 36 L. Ed. 2d 656 (1973));[6] <u>Gonzales v. Bartos</u>, No. CV 06-2558-PHX-EHC, 2009 WL 825812, at *15 (D. Ariz. Mar. 30, 2009) (probation revocation proceedings are not criminal prosecutions, and thus are not subject to the strictures of <u>Brady</u>). Therefore, Petitioner is not entitled to relief on his claim that the Athens-Clarke County Police Department and Parole Commission violated his due process rights under <u>Brady</u> by failing to disclose or produce the answering machine tapes or the transcript thereof.

F.    <u>Ground Six: "Petitioner's 6th and 14th Amendment Due Process Right to Proper Notice of the Charge Against Him was Violated by Respondent's Failure to Give Petitioner Notice of What Statutes He was Being Charged With."</u>

Petitioner asserts he was charged with violating his parole by failing to abide by the law, but none of the notices of the parole violation included the statutory citation of the law he allegedly

---

[6] The undersigned cites <u>United States v. Ataya</u> only as persuasive authority and recognizes that the opinion is not considered binding precedent. *See* 11th Cir. R. 36-2.

violated (Doc. 1 at 17; Doc. 12 at 29–31).  He contends this violated his due process rights because he was not provided sufficient notice of the charge (Doc. 1 at 17; Doc. 12 at 29–31).

The Parole Commission did not address whether Petitioner exhausted this claim in the state courts.  The Commission contends Petitioner's due process claim is without merit (*see* Doc. 153 at 4–6).

The record indicates that Petitioner was provided a notice of the preliminary hearing, which identified the parole violation date and detailed the factual basis for the charge, that is making harassing phone calls (*see* Doc 129-2, Ex. J at 30).  Petitioner attended the preliminary hearing at which the charge and the factual basis for the charge were extensively discussed (*see* Doc. 2 at 11–29).  Petitioner was then provided a notice of the final revocation hearing, which also identified the violation date and detailed the factual basis of the alleged violation, specifically, Petitioner's failure to obey the law by making harassing phone calls (*see id.* at 50).  Additionally, the charging document in Petitioner's criminal case in Georgia, filed prior to Petitioner's final parole hearing, cited the Georgia harassing phone call statute, O.C.G.A. § 16-11-39 (*see id.* at 48).  Despite the lack of citation to a specific statute in the notice of final revocation hearing, the phrase "unlawfully and intentionally mak[ing] harassing phone calls" gave Petitioner adequate notice of the nature of the violation (*see id.* at 6).  Therefore, Petitioner has failed to show that the Parole Commission failed to provide sufficient notice of the violation, in violation of <u>Morrissey</u>.

G.     <u>Ground Seven:  "Denied Due Process Right to Cross Examination in Violation of the 6th and 14th Amendment[s]."</u>

Petitioner contends he was denied the opportunity to cross-examine his Georgia parole officer, Clinton Talton (*see* Doc. 1 at 17–20).  He asserts that after the revocation proceedings concluded on June 28, 2001, the hearing examiner contacted Mr. Talton and obtained his opinion as to whether Petitioner's parole should be revoked (*id.*; Doc. 12 at 32–34).  Petitioner contends this violated his constitutional rights under <u>Morrissey</u> because he was prevented from confronting and cross-examining Mr. Talton (Doc. 1 at 17–20; Doc. 12 at 32–34).  Petitioner further contends the hearing examiner's conduct violated Florida law (Doc. 1 at 17–20; Doc. 12 at 32–34).

The Parole Commission again did not address whether Petitioner exhausted this claim in the state courts.  The Commission contends Petitioner's claim is without merit (*see* Doc. 153 at 6–7).

There is nothing in the record to suggest that the hearing examiner considered information from Mr. Talton in making his decision. In the hearing summary, the hearing examiner plainly stated that his findings and conclusions rested on the evidence adduced at the final revocation hearing, and he identified the evidence he relied upon. This evidence did not include information from Mr. Talton. Therefore, Petitioner has failed to show that the hearing examiner's contacting Mr. Talton violated his due process rights under <u>Morrissey</u>. Additionally, as discussed *supra*, Petitioner's claims of state law violations do not present a basis for federal habeas relief. Therefore, he is not entitled to relief on this claim.

H.    <u>Ground Eight:  "The First Judicial Circuit Court Erred and Denied Petitioner Due Process in Violation of the 6th and 14 Amendment[s] by Dismissing Petitioner's 'Motion to Compel Compliance' to Enforce the Subpoena the Court Issued on Bell South, which Prevented Evidence Essential to Prove Petitioner's Actual Innocence Claim."</u>

Petitioner states that on July 8, 2003, he filed a habeas petition in the Circuit Court in and for Escambia County, Florida, Case No. 2003-CA-001397, challenging the legality of the parole revocation (*see* Doc. 1 at 18–19; Doc. 12 at 35–37). He states he filed a motion requesting issuance of a subpoena to obtain documents from a third party, specifically, records from Bell South identifying the subscriber names and addresses of the telephone numbers appearing in Ms. Johnston's telephone records from July 11–26, 2000 (*see* Doc. 1 at 18–19; Doc. 12 at 35–37). Petitioner asserts the state court issued the subpoena but failed to enforce it when Petitioner filed a motion to compel (apparently upon Bell South's failure to respond) (*see* Doc. 1 at 18–19; Doc. 12 at 35–37). Petitioner contends the state court thus precluded him from demonstrating his actual innocence, in violation of his due process rights (*see* Doc. 1 at 18–19; Doc. 12 at 35–37).

The Parole Commission did not address whether Petitioner exhausted this claim in the state courts. The Commission contends Petitioner's claim is without merit (*see* Doc. 153 at 7–9).

It is well established in the Eleventh Circuit that a § 2254 court is not an appropriate forum for a prisoner who wishes to challenge the process afforded him in state collateral proceedings. This is so, because such a claim represents an attack on a proceeding collateral to the prisoner's confinement and not the confinement itself. *See* Quince v. Crosby, 360 F.3d 1259, 1261–62 (11th Cir. 2004) (affirming district court's denial of habeas relief based on state court judge's refusal to

recuse himself from the Rule 3.850 hearing, explaining "while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief."); Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987) (per curiam) (concluding § 2254 claim that petitioner's due process rights were violated when state post-conviction court held no evidentiary hearing and failed to attach appropriate portions of record to its opinion "goes to issues unrelated to the cause of petitioner's detention [and] does not state a basis for habeas relief").  In the instant case, the state habeas proceeding where this alleged due process violation occurred was not part of the direct review process of the Parole Commission's decision, rather, the state habeas proceeding filed in the Circuit Court in Lafayette County, Case No. 2001-CA-000117, was the direct review proceeding.  Because Petitioner's claim challenges only the process afforded him in a state collateral review proceeding and does not represent a constitutional challenge to Petitioner's confinement, it does not provide a basis for federal habeas relief.

IV.    PENDING MOTIONS

As a final matter, the court will address Petitioner's two most recently filed motions, a motion requiring the Parole Commission to produce a transcript of his final parole revocation hearing (Doc. 160) and a motion to stay the instant case (Doc. 159).

A.    Motion to produce transcript

Petitioner acknowledges that the state court record includes a summary of the evidence adduced at the final revocation hearing, but he argues that a transcript of the hearing is necessary because it will prove that there was no evidence that he violated the Georgia harassing phone call statute.  Petitioner cites 28 U.S.C. § 2254(f) as authority for his motion.

Section 2254(f) provides:

If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination.  If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official.  If the State cannot provide such pertinent part of the record, then the court shall determine under

the existing facts and circumstances what weight shall be given to the State court's factual determination.

28 U.S.C. § 2254(f).

The court notes that among Petitioner's many submissions to this court is his own affidavit declaring under penalty of perjury that he received the audio taped recording of his final revocation hearing (*see* Doc. 12, Appendix at A29–A31, A53–A55).[7]  In his affidavit, Petitioner includes his own verified transcription of those portions of the audio taped proceedings that he apparently deems relevant to his claims.  The court has considered Petitioner's partial transcript as part of the record in this case.[8]  It is thus evident that Petitioner is able to produce that part of the record he deems pertinent.  Accordingly, he has failed to show that production of a complete transcript is required under § 2254(f).

Furthermore, the hearing summary provides a sufficient record for this court's review of the proceedings.  The Eleventh Circuit has held that a hearing summary prepared by the parole examiner satisfies the United States Supreme Court's requirement that the fact finder provide a written statement of the evidence relied upon and the reasons for revoking parole, and this summary provides a sufficient record for a review of the proceedings.  *See* Glumb, 891 F.2d at 873–74 (citing Morrissey, 408 U.S. at 481); Hrynko v. Crawford, 402 F. Supp. 1083, 1085 (E.D. Pa. 1975)).  Indeed, in Glumb, the Eleventh Circuit noted that it was aware of no federal decision requiring a verbatim transcript of parole revocation proceedings.  891 F.2d at 874.  This court is not aware of any such decision issued after Glumb that requires a verbatim transcript of a parole revocation proceeding where a written summary of the hearing is available.  Therefore, Petitioner has failed to demonstrate that a full transcript of the final hearing is required under § 2254 or is otherwise necessary for review of his claims.  Accordingly, his motion will be denied.

B.  Motion for Stay

---

[7] Apparently, the final revocation hearing was reconvened on June 28, 2001, at the request of Petitioner's counsel, to enable the defense to obtain additional information and evidence, including Petitioner's testimony, copies of money orders, and evidence of the results of a polygraph examination of Petitioner (*see* Doc. 129-2, Ex. K at 43–51; Doc. 12, Appx. at A58).

[8] The court is hereby providing the Parole Commission an opportunity to deny the correctness of the partial transcript.  *See* Rules Governing Section 2254 Cases 7.

Petitioner requests that this federal action be stayed to permit him to exhaust two claims in the state courts: (1) a claim of actual innocence based upon newly discovered evidence, that is, the transcript of Ms. Johnston's answering machine tapes, and (2) a claim that the Parole Commission violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) by withholding the transcript of the tapes (Doc. 159). Petitioner states he specifically requested the answering machine tapes from the Athens Georgia Police Department, but that agency failed to provide them (*id.* at 4). He additionally states the transcript of the tape (included in Detective Ivey's police report, which was part of the parole file (*see* Doc. 129-2, Ex. K at 59–60; Doc. 152 at 1–3), proves that his telephone calls to Ms. Johnston did not satisfy the intent element of the Georgia harassing phone call statute (*see* Doc. 159 at 4–5).

The only circumstances in which the United States Supreme Court has recognized the availability of a stay of federal proceedings in a habeas case is where a federal petition contains both exhausted and unexhausted claims and the district court determines there was good cause for the petitioner's failure to exhaust his claims first in the state court, and the unexhausted claims are not "plainly meritless." *See* <u>Rhines v. Weber</u>, 544 U.S. 269, 277, 125 S. Ct. 1528, 1535, 161 L. Ed. 2d 440 (2005). In such cases, the Supreme Court held the district court should stay the federal habeas action to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then return to federal court for review of his perfected petition. *Id.*

For the reasons discussed in this Report and Recommendation, Petitioner's freestanding claim of actual innocence is not cognizable in federal habeas, and his <u>Brady</u> claim is plainly meritless. Therefore, Petitioner has failed to show that this case qualifies for imposition of a stay under <u>Rhines</u>.

Additionally, even if the court employed the ordinary principles governing stays in civil cases, that is, the standard for granting temporary relief, Petitioner has failed to demonstrate he qualifies for such relief. The purpose of preliminary injunctive relief is to preserve the status quo between the parties and to prevent irreparable injury until the merits of the lawsuit itself can be reviewed. *See* <u>Devose v. Herrington</u>, 42 F.3d 470, 471 (8th Cir. 1994). The grant or denial of preliminary injunctive relief rests in the discretion of the district court. *See* <u>Carillon Importers, Ltd.</u>

v. Frank Pesce Intern. Group Ltd., 112 F.3d 1125, 1126 (11th Cir. 1997) (citation omitted). The district court, however, must exercise its discretion in light of whether:

> 1.     There is a substantial likelihood that Plaintiff will prevail on the merits;

> 2.     There exists a substantial threat that Plaintiff will suffer irreparable injury if the injunction is not granted;

> 3.     The threatened injury to Plaintiff outweighs the threatened harm injunction will do to the defendant; and

> 4.     The granting of the preliminary injunction will not disserve the public interest.

See CBS Broadcasting, Inc. v. Echostar Communications Corp., 265 F.3d 1193, 1200 (11th Cir. 2001) (citation omitted); Carillon Importers, Ltd., 112 F.3d at 1126. "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to the four requisites." CBS Broadcasting, Inc., 265 F.3d at 1200 (citation omitted).

In the instant case, Petitioner has failed to demonstrate a substantial likelihood of success on the merits on any of the claims raised in his petition. Furthermore, imposing a stay in this action would undermine the purposes of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), that is to "further the principles of comity, finality, and federalism." See Miller-El v. Cockrell, 537 U.S. 322, 337, 123 S. Ct. 1029, 154 L. Ed. 2d 913 (2003) (internal quotation marks omitted). Therefore, Petitioner has failed to carry his burden of persuasion in establishing that he qualifies for preliminary injunctive relief.

## V.     CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

Petitioner's "Motion for Order Directing Respondent to Present Evidence" (Doc. 160) is **DENIED**.

And it is respectfully **RECOMMENDED**:

1.     That Petitioner's Motion for Stay and Abeyance (Doc. 159) be **DENIED**.

2.     That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

3.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>13</u><sup>th</sup> day of January 2010.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**